# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MARGARET DEWEESE-BOYD,

       Plaintiff,

v.

GORDON COLLEGE, D. MICHAEL
LINDSAY, JANEL CURRY, HERMAN
SMITH, and MYRON ULLMAN III,

       Defendant.

Civil Action No. 1:22-cv-10323-IT

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Respectfully submitted,

GORDON COLLEGE, D. MICHAEL LINDSAY,
JANEL CURRY, HERMAN SMITH, and MYRON
ULLMAN III

By their attorneys,

*/s/ Benjamin R. Davis*
Benjamin R. Davis (BBO #673017)
benjamin.davis@jacksonlewis.com
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA  02116
(617) 367-0025

Ashley B. Abel (admitted pro hac vice)
Ashley.Abel@jacksonlewis.com
Jackson Lewis P.C.
15 South Main Street
Suite 700
Greenville, SC 29601
(864) 672-8036

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................ 1

II.    PROCEDURAL BACKGROUND ...................................................................... 1

III.   NATURE OF THE CASE ................................................................................... 4

IV.   FACTS ................................................................................................................ 6

V.    ARGUMENT ...................................................................................................... 11

  A.    Standard of Review ...................................................................................... 11

  B.    Plaintiff's Claims Are Barred By The Ministerial Exception. ...................................... 12

    1.   *Gordon is a Religious Institution* ................................................................. 13

    2.   *Plaintiff is a Ministerial Employee* .............................................................. 14

    3.   *Application of the Ministerial Exception at the Motion to Dismiss Stage is Critical to Protecting Defendants' First Amendment Rights* ................................................ 16

    4.   *The Ministerial Exception Bar All of Plaintiff's Claims* ................................ 19

  C.    All Claims in the FAC Should be Dismissed Based on the Express and Penumbra of Religious Prohibitions, Protections, and Rights Provided by the First Amendment to the United States Constitution................................................................................ 20

  D.    Counts I through VI Are Barred By Exemptions Under Chapter 151B........................ 25

  E.    Counts VII through VIII Are Barred By Exemptions Under 42 U.S.C. § 2000e-1 and 2000e-2.................................................................................................... 27

  F.    Plaintiff's MCRA Claim and Contract Claims Should be Dismissed as Derivative of Her 151B claims.................................................................................................. 30

  G.    Plaintiff's Federal Law Discrimination and Retaliation Claims Brought Under 42 U.S.C. § 2000e, et seq., Should be Dismissed Because Gordon's Specific Religious Tenets Are a Bona Fide Occupational Qualification. ................................................................. 32

  H.    The Massachusetts Discrimination and Retaliation Claims Brought Under 151B, §4 Should be Dismissed Because Gordon's Specific Religious Tenets Are a Bona Fide Occupational Qualification. ......................................................................... 34

  VI.   CONCLUSION .................................................................................................. 36

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Adams v. Ind. Wesleyan Univ.*, 2010 WL 2803077, at \*9 (N.D. Ind. July 15, 2010) .................. 13

*Aguillard v. La. Coll.*, 341 F. Supp. 3d 642 (W.D. La. Sept. 19, 2018) ....................................... 28

*Alicea-Hernandez the Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003) ..................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 11, 12

*Baker v. Columbia Sussex Mgmt., LLC,* 2021 U.S. Dist. LEXIS 247240, \*10 (D. Mass. Dec. 29, 2021) ..................................................................................................................................... 31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 12

*Bennett v. Saint-Gobain Corp.*, 507 F.3d 23 (1st Cir. 2007) ....................................................... 31

*Blackstone v. Cashman*, 448 Mass. 255 (2007) ........................................................................... 31

*Bolduc v. Town of Webster*, 629 F. Supp. 2d 132 (D. Mass. 2009) ............................................. 30

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ............................................................. 23, 24

*Carrero-Ojeda v. Autoridad De Energía Eléctrica*, 755 F.3d 711 (1st Cir. 2014) ............... 11, 12

*Charland v. Muzi Motors*, 417 Mass. 580, 631 N.E.2d 555 (1994) ............................................ 30

*Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24 (1st Cir. 2000) ........................ 1, 12

*Colon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015) ........................... 13, 14

*Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987) ........................................................... 28

*Curay-Cramer v. Ursuline Academy*, 450 F.3d 130 (3d Cir. 2006) ............................................ 29

*Dyer v. E. Coast Diners, LLC*, 33 F. Supp. 3d 82, (D. Mass. 2014) ........................................... 31

*EEOC v. Catholic Univ. of Am.*, 83 F.,3d 455 (D.C. Cir. 1996) ........................................... 13, 17

*EEOC v. Kamehameha Sch./Bishop Estate*, 90 F.2d 458 (9th Cir. 1993), cert. denied, __ U.S. __ (1993) ..................................................................................................................................... 34

*EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980) ................................................. 23, 29

*Eichenholz v. Brink's Inc.,* Case No. 16-cv-11786-LTS, 2019 U.S. Dist. LEXIS 35522, \*27-29 (D. Mass. Mar. 9, 2019) ....................................................................................................... 30

*Fulton v. City of Philadelphia*, 593 U. S. __, __ S. Ct. __ (2021) .......................................... 18, 23

*Glowacki-Bishop v. Western & Southern Fin. Grp. Inc.,* 2021 U.S. Dist. LEXIS 244806, \*10, __ F.Supp.3d __, 2021 WL 6098729 ............................................................................................ 31

*Gordon College v. DeWeese-Boyd*, 595 U. S. __, __ S. Ct. __ (2022) .................................. 12, 17

*Grussgott v. Milwaukee Jewish Day School, Inc.*, 882 F.3d 655 (7th Cir. 2018) ........................ 15

*Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618 (6th Cir. 2000) ................................... 28

*Harlow v. Children's Hosp.*, 432 F.3d 50, 55 (1st Cir. 2005) ...................................................... 3

*Haufler v. Zotos,* 446 Mass. 489 (2006) ................................................................ 31

*Hiles v. Episcopal Diocese of Mass.,* 773 N.E.2d 929 (Mass. 2002) .......................... 20

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,* 565 U.S. 171 (2012) ... passim

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,* 334 U. S. 94 (1952) ............................................................................................. 23

*Kennedy v. St. Joseph's Ministries,* 657 F.3d 189 (4th Cir. 2011) ............................. 28

*Killinger v. Samford Univ.,* 113 F.3d 196, 200-201(11th Cir. 1997).................................... 23, 28

*King v. Driscoll,* 418 Mass. 576, 584 n. 7, 638 N.E.2d 488 (1994) ............................. 31

*LaFountaine v. BJ's Wholesale Club, Inc.,* No. 080487D, 2008 Mass. Super. LEXIS 359, 2008 WL 4926675, at *6 (Mass. Super. Oct. 27, 2008)................................................. 30, 32

*Lee v. Mt. Zion Baptist Church of Pittsburgh,* 903 F.3d 113 (3rd Cir. 2018)............................. 20

*Lemon v. Kurtzman,* 403 U. S. 602 (1971) .............................................................. 16

*Lishu Yin v. Columbia Int'l Univ.,* 335 F. Supp. 3d 803 (D. S.C. 2018)...................................... 13

*Little v. Wuerl,* 929 F.2d 944 (3d Cir. 1991).................................................... 22, 28, 29

*Lynch v. Donnelly,* 465 U. S. 668 (1984).................................................................. 22

*Maguire v. Marquette Univ.,* 627 F. Supp. 1499 (E.D. Wis. 1986), aff'd in part on other grounds, vacated in part, 814 F.2d 1213 (7th Cir. 1987) ........................................................... 29

*Negron-Almeda v. Santiago,* 579 F.3d 45 (1st Cir. 2009) ....................................... 3, 12

*Our Lady of Guadalupe School v. Morrissey-Berru,* __ U. S. __, 140 S. Ct. 2049 (2020)... 15, 16, 18

*Perez-Ruiz v. Crespo-Guillen,* 25 F.3d 40 (1st Cir. 1994)........................................... 3

*Piatti v. Jewish Cmty. Ctrs.,* 1993 Mass. Super. LEXIS 328, *15-16 (Mass. Super. Ct., Dec. 14, 1993)......................................................................................................... 34, 35

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem. Presbyterian Church,* 393 U. S. 440 (1969) ................................................................................ 18

*Prey v. Franciscan Univ. of Steubenville,* 2021 U.S. App. LEXIS 32651, *7-8 (6th Cir. Nov. 2, 2021).......................................................................................................... 28

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,* 772 F.2d 1164 (4th Cir. 1985) ..................... 17

*Reynolds v. United States,* 98 U.S. 145 (1878) ....................................................... 22

*Roberts v. United States Jaycees,* 468 U.S. 609 (1984)............................................. 24

*Saeemodarae v. Mercy Health Services,* 456 F. Supp.2d 1021 (N.D. Iowa 2006)...................... 29

*Seattle's Union Gospel Mission v. Woods,* 481 P.3d 1060 Washington LEXIS 148; cert. denied, __ U.S. __ (2022) .......................................................................................... 23

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.,* 363 F.3d 299 (4th Cir 2004) ................ 14

*Spatafore v. Analogic Corp.,* 2017 Mass. Super. LEXIS 2898, *9 .............................. 32

*Spencer v. World Vision, Inc.*, 619 F.3d 1109 (9th Cir. 2010) ..................................................... 33

*Trans-Spec Truck Serv. v. Caterpillar Inc., 524 F.3d 315* (1st Cir. 2008) ..................................... 1

*United States v. Ballard*, 322 U.S. 78 (1944) ............................................................................ 22

*Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 474 Mass. 382, 50 N.E.3d 778, 783 (2016) .......................................................................................................... 30

*Wheatley v. American Tel. & Tel. Co.*, 418 Mass. 394, 636 N.E. 2d 265 (1994). ........................ 35

*Winkelman v. CVS Caremark Corp.*, 827 F.3d 201 (1st Cir. 2016)................................................. 6

*Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469 (1992) ..................................... 31

*Zorach v. Clauson*, 343 U. S. 306 (1952) ................................................................................. 22

## STATUTES

42 U.S.C. § 2000bb(b) .................................................................................................. 19

42 U.S.C. §§ 2000bb(2), 2000bb-1(b) ............................................................................ 19

42 U.S.C. §2000e .............................................................................................. 4, 5, 27, 32, 33

42 U.S.C. § 2000e-1 ..................................................................................................... 29

42 U.S.C. § 2000e-1(a) ................................................................................................ 27

42 U.S.C. § 2000e-2 ..................................................................................................... 29

42 U.S.C. § 2000e-2(e)(2).......................................................................................... 28, 32

42 U.S.C. § 2000e(j) .................................................................................................... 28

G. L. c. 12, §§ 11H, 11I ........................................................................................ 2, 3, 5, 31

G.L. c. 151B ............................................................................................................. passim

G. L. c. 151B, § 1(5) .................................................................................................... 25

G. L. c. 151B, § 4 ....................................................................................................... 2, 34

G. L. c. 151B, § 4(18) .................................................................................................. 25

G. L. c. 151B, § 9 .................................................................................................. 1, 2, 30

## RULES

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 1

## TREATISES

5 C. Wright & A. Miller, Federal Practice & Procedure § 1327 at 489 (1969)............................ 12

## I.     <u>INTRODUCTION</u>

Defendants Gordon College ("Gordon" or the "College"), D. Michael Lindsay, Janel Curry, Herman Smith and Myron Ullman III (collectively, "Defendants"), submit this Memorandum of Law in support of their Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] As explained below, this lawsuit seeks to use the courts to enforce federal and state employment laws, which, if permitted would destroy the express, long, and sincerely held religious beliefs and requirements of a religious educational institution in violation of the U.S. Constitution and would remake Gordon College in the image of Plaintiff's religious beliefs. Such use of the courts is improper, unconstitutional, and violates express legislative exemptions and judicial precedent, all as set forth below. Defendants request that all claims in the FAC be dismissed as a matter of law, with prejudice and with costs to Defendants.

## II.    <u>PROCEDURAL BACKGROUND</u>

On September 13, 2017, Plaintiff commenced a civil action in the Massachusetts Superior Court for Essex County against Gordon College and its then President (D. Michael Lindsay) and Provost (Janel Curry). Plaintiff alleged in her Complaint that the Defendants unlawfully retaliated against her for her vocal opposition to Gordon's policies and practices regarding sexual orientation, particularly with regard to individuals who identify as lesbian, gay, bisexual, transgender, or queer (or questioning), and others (LGBTQ+ persons), by denying her application for promotion to full professor. Specifically, she alleged unlawful retaliation in violation of G. L. c. 151B, § 9; unlawful

---

[1] As required, Defendants file the instant motion based on allegations contained in the First Amended Complaint ("FAC"), Doc. No. 1-3 at 386-424, which are taken as true for purposes of this motion only. Defendants also rely on documents expressly referenced in the FAC but not attached thereto, without converting this motion to one for summary judgment. *Trans-Spec Truck Serv. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008); *Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 32 (1st Cir. 2000).

discrimination on the basis of her association with LGBTQ+ persons or on the basis of her gender in violation of G. L. c. 151B, § 9; as to the individual defendants, aiding and abetting discriminatory and retaliatory acts and interference with her rights in violation of G. L. c. 151B, § 4; violation of the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, §§ 11H, 11I; breach of contract; breach of the implied covenant of good faith and fair dealing; and tortious interference with contractual or advantageous relations.

Defendants moved for judgment on the pleadings in Massachusetts Superior Court based on First Amendment grounds, as well as other grounds including the religious exemption under Chapter 151B, failure to allege "threats, intimidation, or coercion" necessary to sustain a claim under the MCRA, failure to allege "actual malice" necessary to sustain a claim for tortious interference, and failure to allege a breach of contract. The Court denied Defendants' motion for judgment on the pleadings on July 25, 2018, but subsequently ordered bifurcated discovery on the College's First Amendment defenses. *See* MJOP Decision, Doc. No. 1-3 at 450-458, 477-481.

Following this limited discovery solely on the question of the ministerial exception, which prohibits government interference with employment relationships between religious institutions and their ministerial employees, the parties cross-moved for summary judgment on the question whether the ministerial exception barred Plaintiff's claims. On April 3, 2020, a Superior Court judge allowed Plaintiff's motion and denied Defendants' motion, holding further that Gordon is a religious institution but Plaintiff was not a minister for purposes of the ministerial exception. On April 24, 2020, the same judge granted the Defendants' motion to report to the Appeals Court the question whether the dismissal of Defendants' summary judgment motion was error. The Supreme

2

Judicial Court subsequently allowed Gordon's application for direct appellate review and on March 2, 2021 upheld the trial court's decision.[2]

On January 27, 2022, Plaintiff amended her Complaint (hereinafter referred to as "FAC") to add Herman Smith and Myron Ullman III as Defendants, and to assert five new claims relating to the rightsizing efforts of Defendant Gordon College in May 2019, which Plaintiff refers to as "termination" claims.[3] The first three such claims allege retaliation, discrimination, and aiding and abetting liability under Massachusetts law (G.L. c. 151B). *See* FAC, ¶¶ 150-160, Counts IV-VI,

_____

[2] The law of the case doctrine has no application to interlocutory orders. *Harlow v. Children's Hosp.*, 432 F.3d 50, 55 (1st Cir. 2005); *see also Perez-Ruiz v. Crespo-Guillen,* 25 F.3d 40, 42 (1st Cir. 1994) ("interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case."). Thus, the law of the case does not apply to the trial court's motion for judgment on the pleadings decision on matters other than the ministerial exception, as the summary judgment decision and subsequent appellate review concerned only that specific issue. This is especially true here, where the Superior Court's ruling devoted a single sentence to the non-constitutional arguments asserted in Defendants' motion. See MJOP Decision) (Doc. No. 1-3 at 458) ("Because all of the other arguments the Gordon Defendants raise in their motion stem from the constitutional arguments addressed above, the court denies the Motion for Judgement on the Pleadings as to all counts."). That reasoning is plainly incorrect, and no Massachusetts court has substantively analyzed Defendants' non-constitutional grounds for dismissal. In addition, this Court may properly consider the application of the ministerial exception to this case. "Nevertheless, courts may reopen a matter previously decided on a showing of exceptional circumstances-a threshold which, in turn, demands that the proponent accomplish one of three things: show that controlling legal authority has changed dramatically; proffer significant new evidence, not earlier obtainable in the exercise of due diligence; or convince the court that a blatant error in the prior decision will, if uncorrected, result in a serious injustice." *Negron-Almeda v. Santiago*, 579 F.3d 45, 51-52 (1st Cir. 2009). Based on the four-justice Statement of the Supreme Court, see *infra,* Defendants submit that the legal authority has changed dramatically, and the Supreme Judicial Court's decision was erroneous, warranting the federal Court's review of the constitutional issues presented.

[3] Counts I-III of the FAC, alleging retaliation, discrimination, and aiding and abetting liability under Massachusetts law (G.L. c. 151B) with respect to the denial of Plaintiff's application for full professor, were previously asserted in the original Complaint. Counts IX-XI for violation of the Massachusetts Civil Rights Act (MCRA), G.L. c. 12, §§ 11H, 11I, tortious interference with contractual or advantageous relations, and breach of contract, were pleaded in the original complaint but the Plaintiff has expanded the allegations and named additional defendants in each action. Plaintiff dropped her claim for breach of the implied covenant of good faith and fair dealing in the FAC.

Doc. No. 1-3 at 419-420. Counts VII and VIII of the FAC set forth identical claims for retaliation and discrimination as Count IV and VII but casts them as federal Title VII claims under 42 U.S.C. §2000e, et seq. *See* FAC, ¶¶ 162-169, Doc. No. 1-3 at 420-421. Counts X and XI are based, in part, on the same prior factual allegations, as well as new allegations concerning Plaintiff's termination, and titled tortious interference with contract and breach of contract, respectively, Defendants timely removed to federal court on February 25, 2022.

## III.   <u>NATURE OF THE CASE</u>

Plaintiff was employed as a professor at Gordon College beginning in 1999. She was promoted to Associate Professor in the Department of Sociology and Social Work in 2004, and was granted tenure in 2009. *See* FAC ¶¶ 18-19, Doc. 1-3 at 391. In September 2016, Plaintiff applied for promotion to full professor, which application was denied in February 2017. *Id*. ¶¶ 27-28, Doc. No. 1-3 at 394. In May 2019, as a result of financially driven restructuring efforts campus wide, Plaintiff's position and those of other faculty were eliminated. *Id*. ¶¶61-66, Doc. No. 1-3 at 402-403. Since September 2017, Plaintiff has pursued this lawsuit alleging that Gordon denied her promotion to full professor and eliminated her position pretextually, because she "has been one of the most outspoken critics among the Gordon College faculty regarding the College's policies and practices" which she claims "discriminate against LGBTQ+ individuals," including the College's prohibition against homosexual practice and that marriage is between one man and one woman. *Id*. ¶¶ 23, 24, 31, 67, Doc. No. 1-3 at 392, 394, 403. Plaintiff alleges the denial of her application for promotion and the subsequent elimination of her position constitute retaliation, discrimination, and aiding and abetting by Defendants in violation of M.G.L. c. 151B (Counts I-VI); retaliation and discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq. (Counts VII, VIII), violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, § § 11H, 11I

(Count IX); tortious interference with contractual relations (Count X); and breach of contract (Count XI). *Id.,* Doc. No. 1-3 at 417-422.

Since her employment at Gordon began in 1999, Plaintiff had been required to agree to the College's Statement of Faith and Statement of Life and Conduct, both as explicitly set forth in the Administrative/Faculty Handbook. She was thus required to state her agreement to certain stated Christian beliefs, including that the Bible is inspired by God and, thus, correct and free from error, that marriage is between a man and a woman, and that homosexual practice is expressly forbidden. According to the FAC, beginning around 2013-2014, and for reasons not included in the FAC, Plaintiff claims that she changed her views specifically with regard to homosexuality and marriage and started opposing the College's requirements. *Id*. ¶¶ 23-24. Doc. No. 1-3 at 391-392.

For a court to rule in favor of Plaintiff would require a judicial determination that Gordon College's sincerely held religious beliefs – that marriage is between a man and a woman and against homosexual practice – cannot be applied to Plaintiff or other faculty members because they violate Title VII and/or Massachusetts statutory or common law. This would be implicit in any reinstatement, grant of full professor, and award of lost wages and benefits, all relief she seeks. *Id*. As described in more detail below, not only did Plaintiff begin to disagree with the very affirmations she previously affirmed and signed, for 14 years, she spoke openly on the internet, disagreeing with and advocating for the rewriting or deletion of Gordon's foundational documents and requirements, including the very "contract" upon which she bases her final two causes of action – the Administrative/Faculty Handbook. To make Plaintiff's intentions in this lawsuit abundantly clear, her attorney revealed them recently in an interview and article:

- A:  Honestly, the ministerial exception issue was not [in the] front of [my] mind when I took the case. I was much more just interested in her advocacy on behalf of LGBTQ+ individuals in an environment that had explicit policies that were discriminatory.

- A: I think that there's a concept that "evangelical" means "fundamentalist," and it doesn't. Just because you're evangelical Christian doesn't mean you adhere to a certain set of fundamentalist or conservative Christian ideas. That's in some ways why this issue about LGBTQ+ rights is so interesting.

- A: One of the things that gets lost… is that what the religious institution or the Christian liberal arts college is trying to do is be able to discriminate without consequence.

Kris Olson, Hilary Schwab, Fairwork, P.C., Mass. Law Wkly., Feb. 14, 2022, at B12, attached hereto as *Exhibit D*.[4]

Thus, there is no doubt that Plaintiff intends to use this lawsuit and this Court as a means to eradicate Gordon's long-standing, sincerely-held religious beliefs and related employment requirements about marriage and homosexuality. Plaintiff could have gone to another college or university which has biblical and societal views consistent with her current ones. The reason she did not is apparent: her intention is to use the courts and legislative enactments to force change of Gordon College because she disagrees with its religious beliefs, employment requirements, and intention for faculty to teach and model its beliefs to students. This answer reveals why this case must be dismissed on constitutional as well as statutory grounds.

## IV.   **FACTS**

The Commonwealth of Massachusetts chartered Gordon College for the purpose of carrying on the faith-based educational work begun in 1889 by Gordon's founder, the Reverend Adoniram Judson "A.J." Gordon. *See* Gordon's By-Laws, Exhibit A, Doc. 16-1 at 4, Doc. No. 1-3 at 409-410. Gordon's By-Laws state that Gordon is dedicated to "[t]he historic, evangelical, biblical faith"; [s]cholarship that is integrally Christian"; "[p]eople and programs that reflect the

---

[4] Courts can take judicial notice of relevant news articles in a Rule 12(b)(6) motion. *See Winkelman v. CVS Caremark Corp.*, 827 F.3d 201 (1st Cir. 2016).

rich mosaic of the Body of Christ"; "[l]ife guided by the teaching of Christ and the empowerment of the Holy Spirit"; and "application of biblical principles to transform society and culture." *Id.*, Doc. 16-1 at 4.

As Gordon explains in its Administrative/Faculty Handbook, Gordon's mission is to "graduate men and women distinguished by intellectual maturity and Christian character." Administrative/Faculty Handbook (Oct. 2016) at p. 5, Exhibit B, Doc. 16-2 at 17, Administrative/Faculty Handbook (May 2018) at p. 5, Exhibit C, Doc. 16-3 at 16, Doc. No. 1-3 at 388, 405, 410, 411-412. Gordon thus "approaches its educational task from within fixed reference points of biblical theism, which provides a coherent perspective on life and the world." *Id.* "The principal ingredients of [Gordon's] academic profession of faith" include, *inter alia*, God, Creation, the integration of "faith and learning," and the "Christian Calling." *Id.* at p. 6.

Gordon's objectives embrace challenging the Gordon community to religious reflection, including "[p]ursu[ing] truth as revealed by God in Christ, Scripture and creation"; "[d]evelop[ing] a Christian worldview as a basis for both informed reflection and a reformation of culture"; "[p]ractic[ing] spiritual disciplines to promote lives marked by virtue"; "[b]egin[ning] a journey of lifelong, faith-directed learning"; "[s]erv[ing] the Body of Christ with commitment, fidelity and self-sacrifice"; "[a]cquir[ing] a sense of vocation and calling before God"; and "[p]roclaim[ing] and liv[ing] out the gospel." *Id.* at 5-6.

Gordon requires that all Gordon faculty, administrators, and trustees subscribe to Gordon's evangelical Christian Statement of Faith, through which they affirm their belief that the "66 canonical books of the Bible as originally written were inspired of God" and that there "is one God, the Creator and Preserver of all things, infinite in being and perfection." *Id.* Gordon community members must also explain their devotion to a thoroughly Christian educational

setting. In particular:

- Gordon Board of Trustee members must sign the Statement of Faith [Gordon By-Laws, Doc. 16-1 at 5].

- Students agree to the Statement of Faith and Statement of Life and Conduct. FAC at ¶ 26.

- The Statement of Faith provides, *inter alia*:

  I. The 66 canonical books of the Bible as originally written were inspired of God, hence free from error. They constitute the only infallible guide in faith and practice. A careful translation, such as the New International Version, is sufficiently close to the original writings in text and meaning to be entitled to acceptance as the Word of God. Administrative/Faculty Handbook (Oct. 2016 and May 2018) at p. 7, Exhs. B and C (Doc. 16-2 at 19, Doc. 16-3 at 18).

- The Statement of Life and Conduct provides, *inter alia*:

  <u>Basic Assumptions</u>

  Gordon College strives to maintain its identity as a Christian academic community of students, faculty and staff. The College expects that all members of the College community will:

  1. Call themselves Christian by virtue of the grace of God and their personal commitment to Jesus Christ.

  2. Recognize the Bible to be the Word of God and hence fully authoritative in matters of faith and conduct.

  3. Have a sincere desire for that commitment to mature both in insight and behavior.

  <u>Biblical Principles</u>

  The community recognizes that biblical principles are foundational for corporate life and individual behavior. Those principles which seem most pertinent are the following:

  1. Life within a Christian community must be lived to the glory of God, daily conforming ourselves to the image of Christ and recognizing the Lordship of Christ in every activity (Matthew 22:36-38, 1 Corinthians 10:31, Colossians 3:9, 10, 17).

  \*\*\*

  7. Attaining common goals and insuring orderly community life may necessitate the subordination of some individual prerogatives. Specifically, as servants of

Christ we are called to practice forbearance. Christian freedom includes the option of not doing some things in order to contribute to the good of the larger community (1 Corinthians 8:9-13, 9:19-23, 10:23-33).

8. Certain actions are expressly prohibited in Scripture and are, therefore, wrong. Christians are responsible to avoid those practices which are called sinful in Scripture. Similarly, Scripture commends some actions which are, therefore, right. There are other actions which are matters of individual conviction based on the given situation. In this latter area care must be exercised so as not to judge one another or to cause another to stumble or ourselves to fall (Matthew 7:1, Romans 14:1-23).

9. Christians are not asked to live the Christian life simply on the basis of their own moral character and strength. God has provided the authoritative Word of Holy Scripture, the guiding power of the indwelling Holy Spirit and the counsel of the Church-the body of believes both past and present. Christians are expected to study and obey the Scriptures, to cultivate a heart attitude which allows for the guidance of the indwelling Holy Spirit and to give serious consideration to the counsel of the people of God (2 Timothy 3:16, 2 Peter 1:19-21, 1 John 2:27, 1 Peter 1:19-21, 1 John 2:27, 1Peter 5:1-6).

<u>Behavioral Standards</u>

In light of the above assumptions and biblical principles of Christian conduct, the specific expectations which follow are established for students, faculty and staff of Gordon College. It will be noted that these behavioral standards distinguish between practices governed by Scripture and practices governed by consent of the community for its common good. The latter, which are established to enhance the quality of community living, are not to be confused with specific God-given directives, which are required of all Christians.

Practices Governed by Scripture

The following behavioral expectations are binding on all members of the Gordon community.

1. Those which are expressly forbidden in Scripture, including but not limited to blasphemy, profanity, dishonestly, theft, drunkenness, sexual relations outside marriage, and homosexual practice, will not be tolerated in the lives of Gordon community members, either on or off campus.

Administrative/Faculty Handbook (Oct. 2016 and May 2018) at pp. 8-12, Exhs. B and C, Doc. 16-2 at 20-24 and Doc. 16-3 at 19-23.

- Paragraph 26 of the FAC alleges:

    a. In July 2014, D. Michael Lindsay, President of Gordon College, was one of fourteen religious leaders who signed a public letter that was sent to President Barack Obama,

9

requesting a religious exemption to a planned order barring federal contractors from discriminating on the basis of sexual orientation in their hiring. This statement demonstrates Defendants' intentions and beliefs regarding Gordon College's entitlement to discriminate in and/or place limitations on its hiring on the basis of sexual orientation.

b. Gordon College's Life and Conduct Statement, which appears on its website among other places, and its Student Handbook include a prohibition against "homosexual practice.:  The specific language of this prohibition is as follows: "The following behavioral expectations are binding on all members of the Gordon community. Those words and actions which are expressly forbidden in Scripture, including but not limited to…homosexual practice[] will not be tolerated in the lives of Gordon community members, either on or off campus."

c. Gordon College's hiring policies state that the College does not discriminate based on any individual's sexual orientation as long as the individual" can support and live by our statements of faith and life and conduct," but the Statement of Life and Conduct bans "homosexual practice," essentially invalidating the college's claim that it does not discriminate based on sexual orientation.

FAC, ¶¶26(a), (b), (c), Doc. 1-3 at 393.

**<u>Faculty Responsibilities at Gordon College</u>**

In addition to <u>agreeing</u> <u>with</u> and <u>abiding</u> <u>by</u> the provisions quoted above from the Statements of Faith and Life and Conduct, Gordon's Faculty Handbook expressly states that all professors, including Plaintiff, in all of their courses, "are expected to <u>promote</u> understanding of their disciplines from the perspectives of the Christian faith" and to "<u>exemplify</u> those positive elements of Christian behavior which are taught in Scripture." Doc. 16-2 at 23 and Doc. 16-3 at 22 (emphasis added). The Faculty Handbook explains that Gordon professors must <u>integrate</u> Christian faith with their academic teachings, as "faculty are expected to be fully prepared in all facets of their tasks as Christian teachers and advisors, both inside and outside the classroom. They are expected to strive to engage students in their respective disciplines from the perspectives of Christian faith and to teach with accuracy and integrity."  Doc. 16-2 at 49 and Doc. 16-3 at 54. Unlike a secular institution, "[o]ne of the distinctives of Gordon College is that each member of faculty is expected to <u>participate actively in the spiritual formation</u> of [its] students into godly,

10

biblically-faithful ambassadors for Christ." Doc. 16-2 at 76 and Doc. 16-3 at 84.

Gordon lists "integration" of faith and learning as one of the five core pillars of effective teaching at the College, described by Gordon as the professor's ability to "help[] students make connections between course content, Christian thought and principles, and personal faith and practice[,]" "encourage[] students to develop morally responsible ways of living in the world informed by biblical principles and Christian reflection[,]" and "cultivate[] a sense that 'knowing' is a matter not just of the intellect, but also of faith, praxis and intuitive insight." Doc. 16-2 at 77 and Doc. 16-3 at 74. (Emphasis added).

## V.   ARGUMENT

### A.   Standard of Review

In evaluating a motion to dismiss a claim under Fed. R. Civ. P. 12(b)(6), the Court needs to decide "whether the complaint contains sufficient factual matter to state a claim to relief that is plausible on its face." *Carrero-Ojeda v. Autoridad De Energía Eléctrica*, 755 F.3d 711, 717 (1st Cir. 2014) (Citation omitted)). In conducting this analysis, the Court proceeds in two steps. First, the Court will "ignore statements in the complaint that simply offer legal labels and conclusions, or merely rehash cause-of-action elements. *Id.* (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, while the Court will accept the factual allegations of a complaint as true, the Court must determine whether the factual allegations are sufficient to "state a claim to relief that is **plausible** on its face." *Carrero-Ojeda*, 755 F.3d at 717 (citation omitted and emphasis added). In making this determination, the Court may consider any document referenced in or integral to the FAC. *See Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (in considering a motion to dismiss, a court "may properly consider the

relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint"); *see also* 5 C. Wright & A. Miller, Federal Practice & Procedure § 1327 at 489 (1969).

"Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Stating a "plausible" basis for relief requires something more than merely alleging a "possible" basis for relief, and therefore, "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. Simply stated, to survive a motion to dismiss, "the combined allegations [of the complaint], taken as true, must state a plausible, not merely conceivable, case for relief." *Carrero-Ojeda*, 755 F.3d at 718.

### B.   Plaintiff's Claims Are Barred By The Ministerial Exception.

It is true that the SJC denied summary judgment to some of the current Defendants (two are new to the FAC) and granted summary judgment to Plaintiff on the defense of the ministerial exception to the First Amendment; however, in light of recent clarification from four Justices of the United States Supreme Court in this very case, Defendants respectfully request that the Court consider their motion to dismiss based on exceptional circumstances. *See Negron-Almeda v. Santiago*, supra., fn.1 (only one circumstances is required). The Superior Court's and SJC's beliefs about the controlling legal authority were incorrect or have changed. As discussed further below, four Justices took the exceptional step of issuing a "Statement" expressing "doubts about the state court's understanding of religious education and accordingly its application of the ministerial exception." *Gordon College v. DeWeese-Boyd*, 595 U. S. __, __ S. Ct. __ (2022).

In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, the Supreme Court recognized the "ministerial exception" as a defense to employment discrimination claims brought

against religious organizations. 565 U.S. 171, 188-89 (2012). The defense is based upon the strong interests of religious organizations to select the individuals who hold positions which are ministerial in nature and prohibits application of federal and state employment laws to the decisions that religious institutions make with regard to employment relationships. *Id*. For reasons explained below, Gordon is a religious institution at which Plaintiff is a ministerial employee within the meaning of the ministerial exception.

### 1.   *Gordon is a Religious Institution*

For purposes of the ministerial exception, an institution qualifies as "religious" if its mission is "marked by clear or obvious religious characteristics." *Colon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015). A religious institution need not be a church, synagogue, or other place of worship to qualify. Schools and colleges, such as Gordon, can also qualify as religious institutions for purposes of the ministerial exception. *Id.* at 833; *see also Hossana-Tabor,* 565 U.S. at 188 (Christian elementary school); *EEOC v. Catholic University,* 83 F.3d 455, 474 (D.C. Cir. 1996); *Adams v. Ind. Wesleyan Univ.,* 2010 WL 2803077, at *9 (N.D. Ind. July 15, 2010) (applying the ministerial exception to evangelical Christian university); *Lishu Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803, 804 (D. S.C. 2018) (finding university that defined itself as a "multi-denominational Christian institution of higher education dedicated to preparing world Christians to serve God with excellence" to be religious institution).

Indeed, it is the law of this case, from the Superior Court to the Massachusetts Supreme Judicial Court, that Gordon College is a religious institution as a matter of law. Gordon's By-Laws state that Gordon is dedicated to "[t]he historic, evangelical, biblical faith"; [s]cholarship that is integrally Christian"; "[p]eople and programs that reflect the rich mosaic of the Body of Christ"; "[l]ife guided by the teaching of Christ and the empowerment of the Holy Spirit"; and "application

of biblical principles to transform society and culture." Doc. 16-1 at 4. These documents by themselves establish that Gordon is a religious institution. *See Shaliehsabou v. Hebrew Home of Greater Wash., Inc.,* 363 F.3d 299, 310 (4th Cir 2004) (allowing a nursing home to invoke the ministerial exception because its "by-laws define[d] it as a religious and charitable non-profit corporation and declare[d] that its mission was to provide elder care to 'aged of the Jewish faith in accordance with the precepts of Jewish law and customs'").

As further evidence that Gordon is a religious institution, it requires that all faculty, administrators, and trustees agree to Gordon's evangelical Christian Statement of Faith, through which they affirm their belief that "the Bible as originally written" is "inspired of God" and that there "is one God, the Creator and Preserver of all things, infinite in being and perfection." Doc. 16-2 at 19 and Doc. 16-3 at 18. Gordon's mission is to "graduate men and women distinguished by intellectual maturity and Christian character."  Doc. 16-2 at 17 and Doc. 16-3 at 16. Accordingly, Gordon is a "religiously affiliated entity" whose "mission is marked by clear or obvious religious characteristics," such that it qualifies as a religious institution. *Colon*, 777 F.3d at 834.

### 2.    *Plaintiff is a Ministerial Employee.*

*Hosanna-Tabor* involved a discrimination lawsuit brought by an elementary school teacher at Hosanna-Tabor Evangelical Lutheran Church and School. Even though the majority of the teacher's duties were non-religious, the Court found her position to be within the ministerial exception, given the circumstances of her employment. *Hosanna-Tabor*, 565 U.S. at 190. The Supreme Court moreover did not adopt a "rigid formula" for deciding when an employee's position qualifies for the ministerial exception. Instead, and as amplified in *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U. S. __, 140 S. Ct. 2049 (2020), the High Court noted that the

"the rule in *Hosanna-Tabor* appears to have acquired the label 'ministerial exception' because the individuals involved in pioneering cases were described as 'ministers.' *Our Lady*, 140 S. Ct. at 2060. Moreover, not only are the *Hosanna-Tabor* factors not required they do not have to be met and are not necessarily important in a given case. *Our Lady*, 140 S. Ct. at 2063. Key to this constitutional analysis is recognizing "that educating young people in their faith, inculcating its teachings, and training them to live their faith lie at the very core of the mission of a private religious school." *Our Lady*, 140 S. Ct. at 1064. Notably for our times, the Supreme Court held: "in a country with the religious diversity of the United States, judges cannot be expected to have complete understanding and appreciation of the role … in every religious tradition. A religious institution's explanation of the role of such employees in the life of the religion in question is important." *Our Lady*, 140 S. Ct. at 2066.

Not only was Plaintiff to agree to and abide by[5] the Statements of Faith and Life and Conduct at Gordon, as discussed above, she was also required to "participate actively in the spiritual formation of our students into godly, Biblically-faithful ambassadors for Christ."  Gordon professors must "help [] students make connections between course content, Christian thought and principles, and personal faith and practice," while encouraging students to live "by biblical principles and Christian reflection."  The integration component, in particular is significant for a religious school. For example, in *Grussgott v. Milwaukee Jewish Day School, Inc.*, 882 F.3d 655, 659 (7th Cir. 2018), nothing in the teacher's title suggested she performed ministerial duties. She, like Plaintiff, consistently maintained that her teaching was historical, cultural, and secular, not

---

[5] For a Gordon faculty member to "abide by" the Statements of Faith and Life and Conduct means Plaintiff agreed "to obey" the religious beliefs stated therein.  Black's Law Dictionary, at 6 (5th ed. 1979).  For Plaintiff to "integrate" faith and teaching requires the act of uniting or "to form, coordinate, or blend into a functioning or unified whole." www.merriam-webster.com.

religious. *See* FAC ¶¶ 20-2, Doc. 1-3 at 405-406.  The non-orthodox Jewish school expected its teachers to "integrate religious teachings into their lessons." *Id.* at 659-660. The court held that she was a teacher covered by the ministerial exception. *Id*. at 661 (citing *Hosanna-Tabor*, 565 U.S. at 199) (Alito, J., concurring)).[6]

       3.     *Application of the Ministerial Exception at the Motion to Dismiss Stage is Critical to Protecting Defendants' First Amendment Rights.*

Since "religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of teachers upon whom the schools rely to do this work lie at the very core of their mission." *Our Lady*, 140 S. Ct. at 2055; *Lemon v. Kurtzman*, 403 U. S. 602, 615-16, 618 (1971). "Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate." *Id*. This holding reinforces the reality that the determination of "of whose voice speaks for the [religious school] is *per se* a religious matter." *Alicea-Hernandez the Catholic Bishop of Chicago*, 320 F.3d 698, 704 (7th Cir. 2003). No less than a teacher at a religious school, or a "press secretary" at a church, professors are the "voice" of their institution; they publicly "convey[] the message of" their college. *Ibid*. And so the ministerial exception protects a religious college's choice about who will "teach its message." *Ibid*. Similarly, the D.C. Circuit has held "that the ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve

---

[6] Plaintiff attempts to turn her dereliction of duties on its head by essentially asserting that, since she shirked her religious duties, she therefore did not perform any religious or faith-based instruction and thus did not perform ministerial duties. Such a specious argument cannot stand. She admits and in fact relies on the Handbook and acknowledges the Statements of Faith and Life and Conduct and cannot create within herself an issue of fact.  The College's requirements for her are just that.  The fact she did not uphold them because of her disdain for them is addressed below as an additional ground for dismissal.

its spiritual … mission." *EEOC v. Catholic Univ. of Am.*, 83 F.,3d 455, 463 (D.C. Cir. 1996) (quoting *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)) (emphasis added). The court then applied the exception to cover a Catholic university's decision not to give tenure to one of its professors. *Id.* at 464. The D.C. Circuit noted that while the professor was "not a priest," she sought to obtain tenure "in a field [Canon Law] that is" critical "to the spiritual mission of her Church." *Id.* at 464. But its determination turned primarily on whether the professor's "primary duties consist of teaching, spreading the faith, … or supervision or participation in religious ritual and worship." *Id.* at 461 (citing Rayburn, 772 F.2d at 1169). And her role "clearly fit[] this description because she was part of a faculty whose "stated mission is to 'foster and teach sacred doctrine and disciplines related to it.'" *Id.* at 463-64 (quoting the University's documents). This is why, relying on the College's By-Laws, the Handbook, and the Statements of Faith and Life and Conduct, Justice Alito wrote for four members of the U. S. Supreme Court, in denying certiorari on the procedural ground of finality only, that the SJC's rejection of the ministerial exception defense "reflects a troubling and narrow view of religious education." *Gordon College v. DeWeese-Boyd, supra*. Pointedly, Justice Alito concluded: "I have doubts about the state court's understanding of religious education and, accordingly, its application of the ministerial exception." *Id.*

Agreement with and obedience to the Statement of Faith and Life and Conduct, as well as the faculty requirements quoted about, are not just about rote deference or allegiance. They proved an assurance to students, parents, alumni, donors, and other faculty of exactly what type of education provide by Gordon College, the biblical lens of its teachings, the frame of reference for understanding the frame of reference for guidance and counsel – or conversely what is not taught, permitted, or condoned.

17

Church autonomy and judicial and legislative abstention requires courts not to force religious institutions to litigate to the absolute precipice of unconstitutional imposition until each minute fact or facet is adjudicated fully to trial and appeal. *See Our Lady*, 140 S. Ct. at 2069-70 (Thomas, J., concurring). For, by then, the First Amendment protections have already lost much of their application as the courts become arbiters of what is a religious belief, is it sincerely held, was it recently formed and imposed, is the constitutional imposition a matter of compelling governmental interest, is the imposition the least restrictive means, the list goes on. As a result, in constitutional matters, calls must be decided in favor of not forcing religious institutions to devote years and hundreds of thousands of dollars litigating to defend and demonstrate their religious beliefs. As discussed in *Fulton v. City of Philadelphia*, 593 U.S. .__, __ S. Ct. __, __ (2021). A nine-year odyssey thus barrels on.  No doubt too, those who cannot afford such endless litigation have been…  If religion institutions have to defend endless actions by various detractors, they likely have already lost much if not most of the battle. *Our Lady*, 140 S. Ct. at 2063, fn. 6; *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U. S. 440, 449 (1969). And with each small or large loss, part of our bedrock constitutional rights are lost too. With reference to the instant action, among other losses, the school will have lost students who want to go to Gordon because they do not know whether they will receive the topflight Christian education as stated by the school for over 100 years. The College will have lost current and prospective faculty, administration, staff, and donors who want to know what Gordon stands for. The uncertainty created by years of litigation (4 years and counting already in this case) does irreparable damage even if and by the time the religious schools prevail in court. This case is an example of how a non-meritorious action can be used by a plaintiff to, at a minimum, damage the institution or, at most, change it for posterity into plaintiff's own image.

A dismissal by this Court at this time is appropriate and would also facilitate immediate appellate review of this matter to the First Circuit Court of Appeals and then the United States Supreme Court for the benefit of these parties and the 12,500 other religious schools in the country and their teachers, faculty, students, trustees and communities. It would eliminate the Supreme Court's reticence with regard to finality.

In addition, to the extent this Court applies federal or state discrimination laws to substantially burden Gordon College's and the other Defendants' free exercise of religion, such ruling would violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb(b) (reinstating the test of *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972)). On the facts presented, Plaintiff has not and cannot satisfy her burden of showing a compelling governmental interest to override the First Amendment protections at issue or that the burden imposed on Gordon is the least restrictive means of furthering the government's interest. 42 U.S.C. §§ 2000bb(2), 2000bb-1(b). Sexual orientation was not protected when Title VII was passed in 1964, so Congress can hardly be said to have had any interest, much less a compelling one, in protecting the religious beliefs and employment requirements at issue based on homosexual practice and marriage. In addition, forcing the College to reinstate Plaintiff into the position of her choice and fire another faculty member in the reduced social work department – not to mention effectively eliminating the religious beliefs at issue from Gordon's entire faculty, both now and forever, cannot be said to be the least restrictive means of furthering any purported governmental interest.

4.    *The Ministerial Exception Bar All of Plaintiff's Claims.*

Any argument by Plaintiff that her claims for breach of contract and/or tortious interference fall outside of the ministerial exception should also be rejected. The purpose of the ministerial exception is to "protect [] a religious group's right to shape its own faith and mission through its

appointments," and thus it shields a religious institution's "internal governance" from government interference. *Hosanna-Tabor*, 565 U.S. at 188-89. As such, breach of contract and other such claims are barred where their resolution would involve "excessive government entanglement with religion and thereby offend the Establishment Clause." *See Lee v. Mt. Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 120 (3rd Cir. 2018) (barring contract claim because analyzing the church's defense that the minister was discharged for inadequate spiritual leadership impermissibly entangled the court in religious governance and doctrine); s*ee also Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929, 938 (Mass. 2002) (adjudicating the Church's disciplinary procedures would require judicial intrusion into rules, policies, and decisions which are unmistakably of ecclesiastical cognizance). Allowing Plaintiff's peripheral claims here to proceed would completely undermine the ministerial exception and effectively render it useless. As such, Plaintiff's Complaint should be dismissed in its entirety.

C.     **All Claims in the FAC Should be Dismissed Based on the Express and Penumbra of Religious Prohibitions, Protections, and Rights Provided by the First Amendment to the United States Constitution.**

Beyond the singular consideration of the ministerial exception, this case stands at the intersection of three of the most import constitutional protections ever enacted by a people for their government:  the prohibition of a government from interfering with the free exercise of religion, the prohibition against government from acting in a way which would establish or promote a particular religion or religious belief, and the prohibition against abridging the right to free association. These prohibitions against the government in our country derive from the First Amendment to the United States Constitution. All are designed to afford citizens protection from actions by government which impermissibly intrude on the rights of religious freedom, religious expression, and religious liberty. The allegations and claims set forth in Plaintiff's FAC ask this

Court, as an instrument of the government, to violate these prohibitions and their corresponding rights; to use legislative (governate) emoluments to interfere with Gordon College's long-standing and sincerely held religious beliefs; establish at Gordon College the differing beliefs of Plaintiff; and to preclude the free association and religious expression of persons who attend Gordon based on and in accordance with Gordon's express religious beliefs. As set forth below, there can be no doubt about these conclusions, and this should be dismissed as a matter of law based on the First Amendment to the U.S. Constitution those issues were not addressed by the Massachusetts Supreme Judicial Court.

The discussion presented above establishes that Plaintiff's position is ministerial in nature within the meaning of the First Amendment. It is a form of a functional "duties" test. But what about the fact that Plaintiff was misrepresenting herself by agreeing to, and agreeing to abide by, a statement of religious belief she now admits she has not had and does not have and has not abided by? What about her defiance by not only, as we now know, intentionally not teaching what she was supposed to teach - integration of faith (Gordon's stated faith, not Plaintiff's) and knowledge? What about the lost opportunities of students to receive Gordon's faithful application of the Bible by a faculty member in Plaintiff's position? What about Gordon's right to establish a religious school of its making - consistent with the express provisions of the Bible and have trustees, faculty, and students of like mind and receive Biblical guidance? What about the ability of Gordon students who also sign the Statements of Faith and Life and Conduct to express themselves with faculty and other students of like mind on religious matters? This case cannot be allowed to stand if these rights and privileges of our country are to mean anything? Can they be eviscerated by judicial fiat through application of governmental statutes? What about students and faculty who would

disagree with Plaintiff and joined Gordon because of its precepts - must they join this lawsuit as intervenors for the Court to declare once and for all what Gordon College stands for?

These questions lead directly to the other doctrines of the First Amendment. If this Court were to grant the relief requested, it will have established a religion at Gordon College, either that requested by Plaintiff (e.g., erasing belief in the error-free written Bible, erasing beliefs about marriage and sexual orientation, etc.) or one created by the Court as some amalgam of Plaintiff's and the Court's beliefs. This is decidedly not what the Constitution was designed to permit or accomplish. The prohibition against government establishing a religion or governing religious beliefs is lapidary. *See Reynolds v. United States*, 98 U.S. 145 (1878); *Zorach v. Clauson*, 343 U. S. 306, 314 (1952). This urge to interfere rears its head now in new ways, but no less unconstitutional. The Constitution mandates accommodation, not mere tolerance, of all religions and forbids hostility towards any. *Lynch v. Donnelly*, 465 U. S. 668 (1984). It forbids the punishment of religious beliefs seen to be false. *United States v. Ballard*, 322 U.S. 78, 86-88 (1944). Yet Plaintiff seeks to do precisely that, erase religious beliefs of Gordon College she deems to be wrong by prohibiting their enforcement or application to her and other faculty. Strangely enough, if the Court were to grant the relief sought, it would establish yet another belief, or lack thereof, with which others might disagree and presumably have the right to sue thereafter similarly, *ad infinitum*. The Establishment Clause, clearly precludes Plaintiff's attempt to mold Gordon into her image of religious belief.

The facts presented also implicate the free exercise of religion and the right to free association. Going back to the College's roots with founder Reverend Adoniran J. Gordon, he and other like-minded religious believers to this day have a right to freely associate with others of similar beliefs. *Little v. Wuerl*, 929 F.2d 944, 945-46 (3d Cir. 1991). This doctrine carries to

religious institutions including churches, schools, and others. *See Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000); *Seattle's Union Gospel Mission v. Woods*, 481 P.3d 1060, 2021 Washington LEXIS 148; cert. denied, __ U.S. __ (2022)(Alito, J.); *EEOC v. Mississippi College*, 626 F.2d 477, 479-80 (5th Cir. 1980); *Killinger v. Samford Univ.*, 113 F.3d 196, 200-201(11th Cir. 1997). Religious persons in America enjoy the right "to decide for themselves, free from [governmental] interference, matters of ... faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,* 334 U. S. 94, 116 (1952). The same free exercise and free association protections in the First Amendment's balance and ensure that Reverend Gordon and Plaintiff have the same right to establish a church or religious school and set forth its religious tenets. Neither can constitutionally force the other, through legislation or judicial fiat, to change the religious beliefs thereby established. From this simple but profound First Amendment flows beautiful respect and accommodation of each person's beliefs. However, for it to mean anything with regard to Plaintiff, there must be a corresponding right to enforce those beliefs and take appropriate action, e.g., not grant an application to full professor or require a dissenter to leave and find another place to teach her view of faith and knowledge.

At issue in *Fulton* was whether the non-discrimination provision City of Philadelphia's statute for the provision of foster care services could override the religious beliefs of Catholic Social Services with regard to marriage as sacred bond between a man and a woman. *Fulton v. City of Philadelphia*, 593 U. S. __, __ S. Ct. __ (2021).  CSS refused to certify same-sex married couples or unmarried couples as foster parents because to do so would be an endorsement of those relationships. *Id*. The City said that such position violated a non-discrimination provision in the contract with the City. *Id*. at __. The Supreme Court noted that "religious beliefs need not be acceptable… or comprehensible to others in order to merit First Amendment protection." *Id*.  The

23

Court held in *Fulton* that "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.*

Consider, for example, the freedom to associate and freedom of expression issues presented in *Boy Scouts v. Dale, supra*. The Boys Scouts had a general mission to instill values in young people. 530 U.S. at 644. It engaged in constitutionally protected association and expressive activity in so doing. *Id.* at 636 (O'Connor, J., concurring). The Boy Scouts have certain teachings regarding homosexual conduct as discouraged and considered "not morally straight." *Id.* at 651. The Supreme Court noted in *Dale* that "It is not the role of the courts to reject a group's expressed values because they disagree with those values." *Id.* "As we give deference to an association's assertion regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression." *Id.* at 653. And the fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view. *Id.* at 660. "The forced inclusion of an unwanted person in a group infringes the group's freedom expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints. *Id.* at 648 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)) ("implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of…religious…and so"). The facts before the Court establish Gordon as a religious institution which has set forth a set of religious beliefs and has invited like-minded persons to join it as trustees, faculty, and students to pursue an integrated higher education of faith and learning. There is no basis in law to allow Plaintiff's differing and contrary views to forcibly replace or eliminate Gordon's beliefs.  Indeed, the First

Amendment forbids it. Make no mistake, this case is about religious doctrine and practice, not merely whether Plaintiff should receive full professorship.

In a sense, this lawsuit is reminiscent of the wooden Trojan Horse said to have been used in Greek mythology. In this instance, it is very real. Plaintiff attempts use a Trojan Horse – federal and state law intended to prohibit employment discrimination – which appears to be neutral and non-threatening on its face, but if this Court permits it to be if dragged through the gates of Gordon College, out will crawl a device which would be utterly destructive of the College essential religious nature.

### D.        **Counts I through VI Are Barred By Exemptions Under Chapter 151B**

Plaintiff's FAC alleges the legal conclusion that Gordon is an "employer" for purposes of Chapter 151B. FAC ¶ 11, Doc. 1-3 at 396. Gordon, however, both falls outside the definition of "employer" under Chapter 151B § 1(5) **and** falls squarely within the religious institution exemption under § 4(18).

Section 1(5)'s definition of "employer" expressly excludes any "religious or denominal institution organization **or** any organization operated for … educational purposes, which is operated, supervised, or controlled by or in connection with a religious organization, and which limits membership, enrollment, admission, or participation to members of that religion." Thus, such entities cannot be barred "from taking any action with respect to matters of employment, discipline, faith, internal organization . . . which are calculated by such organization to promote the religious principles for which it is established or maintained." Section 4(18), with some differences in wording, contains exactly the same carve-out.

These clauses exempt Gordon, as both a religious institution and a religious educational institution. As described above, Gordon's fundamental character as a religious institution was explicitly and permanently affirmed almost a century ago when its Board of Trustees recorded the

25

"absolute loyalty of the College to the great evangelical doctrines of the Deity of Christ … and … pledge[d] the College to such loyalty as its permanent policy, and … agree[d] that the Trustees will now and hereafter engage or retain as regular officers, professors or instructors (sic) only such persons as affirm genuine loyalty to these doctrines." Indeed, if Gordon departs from this avowed loyalty, then its endowment is to be distributed to other Christian organizations. *Id*. In other words, it is obligated to be operated as a Christian religious educational institution and has been since its founding more than a century ago.

According to Gordon's By-Laws, its Trustees are the members of the organization, and, in order to serve, must meet strict and comprehensive religious requirements.[7] The Board of Trustees is reposed with the obligation and responsibility to maintain the College's religious beliefs and praxis. *See* Gordon College By-Laws, Article I, Doc. 16-1 at 4-5. The College requires its students to participate in religious activities including chapel services and requires conduct and belief consistent with historic Protestant Christianity all as interpreted by its governing body, the Board of Trustees.

Gordon also "limits membership, enrollment, admission, or participation" in its community – of faculty, students, and staff – to "members" of the Christian religion, and all community members must affirm religious tenets set forth in the Statement of Faith. Community members must also be willing to abide the requirements, explicitly grounded in Scripture, of the Statement

---

[7] Each Trustee is required to be (a) a confessing Christian who has been saved by the grace of God through faith in Jesus Christ alone, and who is in agreement with both the Apostle's and Nicene Creeds; (b) an Evangelical who is actively worshipping and serving in a Christian church; (c) a believer who gives unqualified mental assent to each and every statement contained in the College's Statement of Faith, and so indicates by signing a written copy of that Statement, without equivocation or reservation, once a year at the time of the annual meeting; and (d) an individual who is committed to the enterprise of Christian higher education and who agrees with and fully supports the College's Mission Statement. Ex. A, Doc 16-1 at 6, Gordon College By-Laws, Article II, Section 6.

of Life and Conduct.

Religion permeates the Gordon College experience, given that every faculty member is expressly required to integrate Christian religious principles into each of their courses. In addition, Gordon is an educational organization "operated, supervised, or controlled" by the evangelical Christian religion as governed by the Board of Trustees. Gordon College By-Laws, Article I. Further, Plaintiff's Complaint is that Gordon "[took] … action" against her with respect to "employment," "discipline," and "internal organization," because she repeatedly and vocally attacked Gordon's requirement (intended to "promote" Gordon's "religious principles") that members of the Gordon community agree not to engage in homosexual conduct while affiliated with Gordon. This is precisely the carve-out for religious organizations, including educational institutions, that §§ 1(5) and 4(18) were intended to provide. Accordingly, Gordon is not an "employer" within the scope of G.L. 151B, and Plaintiff's claims against Gordon pursuant to that statute fail as a matter of law.

### E.   Counts VII through VIII Are Barred By Exemptions Under 42 U.S.C. § 2000e-1 and 2000e-2.

Plaintiff's FAC alleges the legal conclusion that Gordon is an "employer" for purposes of 42 U.S.C. § 2000e. FAC ¶ 11, Doc. 1-3 at 396. Gordon, however, falls squarely within the religious institution exemptions under of Title VII. First, Section 702(a) provides that the statute "shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a).[8]  Second, Section 703 exempts schools that are "owned, supported, controlled, or

_____

[8] Prior to its amendment in 1972, Section 702(a) referred to the employment of individuals of a particular religion to perform work for an organization connected with the carrying on of the

managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion" from scrutiny of their hiring and firing decisions of employees of a particular religion. 42 U.S.C. §2000e-2(e)(2). Title VII defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Accordingly, "[t]he decision to employ individuals 'of a particular religion' under § 2000e-1(a) . . . has been interpreted to include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000) (citations omitted).

In *Hall,* the court identified pertinent factors for determining whether the exemptions should apply as including an examination of the "religious nature" of the purported "religious organization."

*Id.* at 625. For all of the reasons set forth above in discussing the ministerial exception, Gordon qualifies as a religious educational institution. *See Prey v. Franciscan Univ. of Steubenville*, 2021 U.S. App. LEXIS 32651, *7-8 (6th Cir. Nov. 2, 2021); *Aguillard v. La. Coll.*, 341 F. Supp. 3d 642, 652, (W.D. La. Sept. 19, 2018); *Killinger v. Samford University*, 113 F.3d 196 (11th Cir. 1997) (affirming dismissal of Title VII claim brought by Baptist university faculty member who was dismissed because religious beliefs differed from those of the school's dean).

---

organization's "religious activities." In 1972, Congress amended Section 702 to drop the word "religious" before "activities." As a result, the current version of Section 702(a) applies to all employees of a religious employer, not just those employees engaged in religious activities. *See, e.g., Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987) (applying the Section 702(a) exemption to a building engineer); *Kennedy v. St. Joseph's Ministries*, 657 F.3d 189, 192 (4th Cir. 2011) (noting that in 1972, Congress broadened section 702(a) "to include any activities of religious organizations, regardless of whether those activities are religious or secular in nature"); *Little v. Wuerl*, 929 F.2d 944, 950-51 (3d Cir. 1991) (noting that the current religious exemptions cover all employees, not just those engaged in religious activities).

These exemptions also clearly apply to Plaintiff's claims. First, Plaintiff premises her discrimination and retaliation claims upon religious preferences. *See* FAC. ¶¶ 31, 167, Doc. 1-3 at 394, 421, (alleging discrimination on the basis of her "advocacy on behalf of" and "association with LGBTQ+ persons"); *Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991) ("Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their [i.e., the organization's] doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.' Against this background and with sensitivity to the constitutional concerns that would be raised by a contrary interpretation, we read the exemption broadly. We conclude that the permission to employ persons 'of a particular religion' includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts. Thus, it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic or a non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles."). Moreover, several courts have applied the Title VII exemptions to bar Title VII claim of sex discrimination or retaliation when the religious employer asserted a sincerely-held theological or doctrinal basis for its challenged employment decision. *See Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 139 (3d Cir. 2006); *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980) (sex and race discrimination claims barred by exemption); *Maguire v. Marquette Univ.*, 627 F. Supp. 1499 (E.D. Wis. 1986), aff'd in part on other grounds, vacated in part, 814 F.2d 1213 (7th Cir. 1987); *Saeemodarae v. Mercy Health Services*, 456 F. Supp.2d 1021, 1039-40 (N.D. Iowa 2006). Accordingly, Counts VII through VIII are barred by the religious exemptions under 42 U.S.C. § 2000e-1 and 2000e-2.

29

**F.**      **Plaintiff's MCRA Claim and Contract Claims Should be Dismissed as Derivative of Her 151B claims.**

G.L. c. 151B provides: "as to acts declared unlawful by section 4, the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive." *Id.* at § 9. "[W]here applicable, G.L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." *Bolduc v. Town of Webster*, 629 F. Supp. 2d 132, 156 (D. Mass. 2009) (quoting *Charland v. Muzi Motors*, 417 Mass. 580, 586, 631 N.E.2d 555 (1994)). A plaintiff may not circumvent the administrative requirements of G.L. c. 151B by asserting common-law claims against him that derive entirely from the same theories and evidence as her statutory claims. *See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 474 Mass. 382, 415, 50 N.E.3d 778, 783 (2016) (upholding dismissal of a tortious interference claim where it is "merely a recast version of a claim that could have been made under Mass. Gen. Laws ch. 151B . . . is barred by that statute's exclusivity provision"); *see also Eichenholz v. Brink's Inc.*, Case No. 16-cv-11786-LTS, 2019 U.S. Dist. LEXIS 35522, *27-29 (D. Mass. Mar. 9, 2019) ("Insofar as the plaintiff's common law claim is merely a recast version of a claim that could have been made under G.L. c. 151B, it is barred by that statute's exclusivity provision. . . . Eichenholz's tortious interference claim is merely a backdoor way of bringing his discrimination claim, which is not proper under the statute."). Indeed, courts have held that preemption bars "factually related claims . . . regardless of whether the plaintiff satisfied the administrative procedural requirements of c. 151B." *LaFountaine v. BJ's Wholesale Club, Inc.*, No. 080487D, 2008 Mass. Super. LEXIS 359, 2008 WL 4926675, at *6 (Mass. Super. Oct. 27, 2008); s*ee also Bolduc*, 629 F. Supp. 2d at 156.

In her FAC, Plaintiff includes only the conclusory statement "the conduct of Defendants D. Michael Lindsay, Janel Curry, Herman Smith, and Myron Ullman, as set forth above,

constitutes tortious interference[9] with Plaintiff's advantageous and/or contractual employment relationship with Gordon College." FAC ¶ 175, Doc. 1-3 at 421-422. Thus, the only "interference" Plaintiff asserts is her promotion denial and termination and the only improper motive that Plaintiff identifies is discriminatory and retaliatory animus, which the SJC has made clear cannot ground a tortious interference claim. *See Glowacki-Bishop v. Western & Southern Fin. Grp. Inc.,* 2021 U.S. Dist. LEXIS 244806, *10, __ F.Supp.3d __, 2021 WL 6098729 (citing *Dyer v. E. Coast Diners, LLC,* 33 F. Supp. 3d 82, 89 (D. Mass. 2014); *King v. Driscoll,* 418 Mass. 576, 584 n. 7, 638 N.E.2d 488 (1994)). Purely as a matter of the allegations within the four corners of the Complaint, Count X must therefore be dismissed.

For nearly identical reasons, Count IX, under the Massachusetts Civil Rights Act[10] (MCRA), Mass. Gen. Laws ch. 12, §§ 11H, 11I, is barred. *Baker v. Columbia Sussex Mgmt., LLC,* 2021 U.S. Dist. LEXIS 247240, *10 (D. Mass. Dec. 29, 2021) (finding the plaintiff "cannot maintain her claim for violation of the Massachusetts Civil Rights Act . . . because Chapter 151B preempts other statutory employment discrimination claims"); *Dyer,* 33 F. Supp. 3d at 90 ("as Chapter 151B provides the exclusive statutory scheme for resolving employment discrimination

---

[9] Because the individual defendants are Gordon officials with responsibilities related to promotions and/or the Prioritization Process, Plaintiff must allege that they acted with "actual malice" in order to support her claim that they tortiously interfered with her alleged contractual relations with Gordon. *Blackstone v. Cashman,* 448 Mass. 255, 260-61 (2007). Yet the FAC nowhere alleges *facts* to support an inference that any of them acted with "a spiteful, malignant purpose, unrelated to the legitimate corporate interest" (*id.,* citing *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 476 (1992)), much less that it was the "controlling factor" leading to any action that they took. *See Bennett v. Saint-Gobain Corp.,* 507 F.3d 23, 33 (1st Cir. 2007).

[10] It is also apparent that the FAC that Plaintiff alleges nothing remotely resembling threats, intimidation or coercion as defined by the SJC. *See Haufler v. Zotos,* 446 Mass. 489, 505 (2006) (explaining that "threats" mean "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" means "putting in fear for the purpose of compelling or deterring conduct"; and "coercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done").

complaints, the plaintiff's MCRA claim is preempted by Chapter 151B"); *Spatafore v. Analogic Corp.*, 2017 Mass. Super. LEXIS 2898, *9; *LaFountaine v. BJ's Wholesale Club, Inc., LEXIS 359,* 2008 WL 4926675, *5-*6.

> **G.** **Plaintiff's Federal Law Discrimination and Retaliation Claims Brought Under 42 U.S.C. § 2000e, et seq., Should be Dismissed Because Gordon's Specific Religious Tenets Are a Bona Fide Occupational Qualification.**

The federal BFOQ exemption is a defense to Plaintiff's claims brought under 42 U.S.C. § 2000e, et seq. The federal BFOQ exemption "permits an employer to employ an individual 'on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.'" *Pime v. Loyola Univ. of Chicago*, 803 F.2d 351, 351-352 (quoting 42 U.S.C. § 2000e-2(e)(2)).

The court in *Pime* held that membership in the Jesuit order was a BFOQ for filling tenure-track professorships because maintaining an adequate Jesuit presence was important to the successful operation of a Jesuit-affiliated university. Here, the defendant's philosophy department passed a resolution reserving the next three vacancies in tenure track teaching positions for Jesuits. Plaintiff, a Jewish professor at Loyola, brought religious discrimination claims under 42 U.S.C. § 2000e-2(a). The court reasoned "that Jesuit presence is important to the successful operation of the university. It appears to be significant to the educational tradition and character of the institution that students be assured a degree of contact with teachers who have received the training and accepted the obligations which are essential to membership in the Society of Jesus." *Id*. at 354 (internal quotation omitted). The court also noted "it seems wholly reasonable to believe that the educational experience at Loyola would be different if Jesuit presence were not maintained." Id. For these reasons, the *Pime* court held that Loyola qualified for the BFOQ exemption.

The federal BFOQ defense should apply to specific religious tenets within Christianity. Like a Jesuit presence being important to the success of Loyola University of Chicago, employing professors that hold tenets consistent with the statement of faith, including upholding conservative Christian views on marriage and sexuality, is critical to the success of Gordon College. By attending Gordon College, students can be assured that their professors' beliefs are aligned with conservative Christian views. Like not maintaining a Jesuit presence at a Jesuit-affiliated university, it is reasonable to believe that students' education experiences at Gordon College would be different if the college employed professors with views that deviated from the statement of faith. The biblical lens that Gordon College professors currently teach through would change by employing professors that openly disagree with tenets underlying the statement of faith. Gordon College requires all students and professors to sign and agree to a statement of faith and conduct, which includes evangelical Christian affirmations and agreements to abide by a conservative Christian view of biblical interpretation, including that marriage is between a man and a woman. *See Spencer v. World Vision, Inc.*, 619 F.3d 1109, 1141 (9th Cir. 2010) (Berzon dissenting opinion) (recognizing the strength of the argument that belief in World Vision's Statement of Faith or the Apostles' Creed is a BFOQ for employees directly involved in carrying out World Vision's religiously motivated humanitarian mission). The understanding of the Bible that marriage alone is the only appropriate venue for sexual relations  and that homosexual practice is outside that venue are two points of praxis that all professors must abide by under Gordon College's Life and Conduct Statement. Thus, the requirement for Plaintiff to live out these understandings is a bona fide occupational qualification for a professor at Gordon College, and Plaintiff's discrimination and retaliation claims under 42 U.S.C. § 2000e, *et seq.*, should be dismissed as a matter of law.

**H.** **The Massachusetts Discrimination and Retaliation Claims Brought Under 151B, § 4 Should be Dismissed Because Gordon's Specific Religious Tenets Are a Bona Fide Occupational Qualification.**

Massachusetts also has a BFOQ exemption, which is a defense to retaliation and discrimination claims brought under G.L. c. 151B. Under the Massachusetts exemption, "it shall be an unlawful practice . . . for an employer . . . because of the race, color, religious creed, national origin, sex, sexual orientation . . . to discriminate against such individual . . . unless based upon a *bona fide occupational qualification*" G.L. c. 151B, §4 (emphasis added). "[T]o qualify as a BFOQ, a discriminatory job qualification must affect an employee's ability to do the job and must relate to the essence or to the central mission of the employer's business." *Piatti v. Jewish Cmty. Ctrs.*, 1993 Mass. Super. LEXIS 328, *15-16 (Mass. Super. Ct., Dec. 14, 1993) (quoting *EEOC v. Kamehameha Sch./Bishop Estate*, 90 F.2d 458, 465 (9th Cir. 1993), cert. denied, __ U.S. __ (1993) (internal quotations omitted)).

Upholding conservative, Christian tenets on marriage and sexuality is a bona fide occupational qualification to work at Gordon college because these tenets are part of Gordon College's central mission. Further, the requirement for professors to uphold these tenets is necessary to teach students through the biblical lens that Gordon College prescribes and holds true. The court in *Piatti* addressed religious beliefs as BFOQs and dismissed plaintiff's discrimination claims brought under G.L. c. 151B, holding that the plaintiff could not perform the duties of the job because being a believing, practicing Jew is a BFOQ for youth director and after-school director positions at a Jewish community center. *Id*. at *1. The plaintiff, a Catholic with in-depth knowledge of Jewish culture and religion, was the former director of the youth program at the Jewish Community Centers of Greater Boston ("JCC"), a charitable, nonprofit corporation that provided services through local Jewish community centers. *Id*. at *2. Because of financial troubles,

JCC eliminated the full-time youth director position, but created a new part-time position to oversee the after-school program. *Id*. at *8. Plaintiff applied for this new position but was rejected in favor of a Jewish applicant. The *Piatti* court held "as evidenced by JCC's mission statement and bylaws, adherence to and practice of the Jewish faith is considered essential to the performance of the jobs in question." *Id*. at *16-17. Under JCC's mission statement, its purposes included to "provide a base for Jewish association and social contacts at various age levels . . . provide positive associations with Jewish experiences . . . provide learning experiences in Jewish values, history, [and] culture." *Id*. at *3. The court held that "intellectual knowledge of Judaism is not the equivalent of belief, practice and membership in the Jewish religion, and does not suffice as a qualification to impart the experience and values of that religion. *Id*. at *20.

Like practicing and believing in the Jewish faith being necessary to "provide learning experiences in Jewish value," upholding a conservative, Christian view of marriage and sexuality is necessary to teach students through the biblical lens that Gordon College upholds. Plaintiff's advocacy and beliefs on LGBTQ+ individuals are admittedly and directly contrary to Defendant's conservative, Christian view of marriage and sexuality as they contradict the school's statement of faith. Plaintiff advocating for the College to change its policies on LGBTQ+ individuals shows that she does not hold the same tenets as Gordon College, and thus fails to meet the bona fide occupational qualification for being a professor there. Thus, Plaintiff's claims brought under 151B should be dismissed under the BFOQ exemption as a matter of law. The Massachusetts Superior Court in *Piatti* looked to federal court rulings under Title VII as instructive and containing similar provisions. *See Piatti* *12; *Wheatley v. American Tel. & Tel. Co*., 418 Mass. 394, 636 N.E. 2d 265 (1994).

## VI.    <u>CONCLUSION</u>

For the reasons stated above, Defendants respectfully request that the Court dismiss

Plaintiff's FAC in favor of Defendants on all claims and enter judgment for Defendants with costs.


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 25th day of March 2022, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Benjamin R. Davis
Benjamin R. Davis